UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO.: 5:06-cv-1-R

LISA OLIVER,                                                                    PLAINTIFF

v.

GREG REYNOLDS, et. al.,                                                   DEFENDANTS

## MEMORANDUM OPINION

This matter comes before the Court on the Defendants' Motion for Summary Judgment (Docket #16). The Plaintiff, Ms. Lisa Oliver ("Ms. Oliver") has responded to the Defendants' motion (Docket #25), and the Defendants have replied to that response (Docket #35). This matter is now ripe for adjudication. For the following reasons, the Defendants' Motion for Summary Judgment (Docket #16) is **GRANTED in part** and **DENIED in part**.

## PROCEDURAL BACKGROUND

On January 15, 2005, officers from the Paducah Police Department ("PPD") arrested Ms. Oliver for third degree unlawful transaction with a minor, in violation of KRS 530.070(1)(a) & (b), Class A misdemeanors. On April 12, 2005, the McCracken District Court conducted an evidentiary hearing (which included a trip to the residence of the Plaintiff) based on a Motion to Suppress filed by the then Defendant in the criminal case, Ms. Oliver. On May 27, 2005, the district court, in an order by the Honorable Bard. K. Brian ("Judge Brian") granted the Motion to Suppress any and all evidence obtained following what the held Court held as "the warrantless entry onto the curtilage of her home," and concluded that the officers did not have the right to enter the home of Ms. Oliver to conduct a warrantless search and seizure. In reaching this determination, the district court noted that: the officers had no corroboration as to whether or not underage drinking was taking place at the Oliver house until after Reynolds entered the curtilage

of the Oliver home; nothing known to the officers as they approached the home in anyway verified the anonymous tip; and third, upon approaching the house the officers did not see anyone underage and consuming alcohol.

The instant complaint was filed against Officer Greg Reynolds ("Reynolds") and Officer Michael Wentworth ("Wentworth"), both individually and as an officer of the PPD; the PPD; and the City of Paducah, for violations of the Plaintiff's Fourth Amendment rights pursuant to 42 U.S.C. § 1983; and against Reynolds and Wentworth for allegedly violating the Plaintiff's rights under Section 10 of the Kentucky Constitution and falsely imprisoning her.

## FACTUAL BACKGROUND

The following facts are taken from the briefs submitted by the parties, as well as the May 27, 2005 order by the McCracken District Court.

On the evening of January 15, 2005, at approximately 11:00PM, the Lone Oak Police Department received an in-person tip alleging that a party with underage drinking was taking place at an area near the Plaintiff's residence, 245 Kennedy Road, Paducah, Kentucky.  The tip was relayed via dispatch to the PPD, and eventually to Officers Reynolds and Wentworth, who responded to the neighborhood near 245 Kennedy Road in separate vehicles.  The officers met near the residence, and they were able to identify it because there were several cars parked in the u-shaped driveway in front of the house and the lights were on throughout the house.  However, there was no loud music and/or presence of alcohol from the front view of the home.

On approaching the house, the officers encountered a minor standing out in front of the residence; however, there was no indication that the minor had been drinking.  Nonetheless, the officers decided to "secure" the house.  At that point, the officers split up, with Reynolds

2

proceeding to the back of the home and Wentworth going to the front door.  Reynolds claims that he went to the back of the home, by the side driveway, in case any of the minors attempted to escape through the back door.  Upon reaching the back of the Oliver property, without a warrant, Reynolds walked around to the back of the house, past an elevated deck, and towards a small porch area outside of the basement, in between the deck and the house; Judge Brian determined that the backyard area where Reynolds walked to get to the porch was part of the curtilage of the Plaintiff's home.

From the back of the backyard, though it is not clear where he was standing, Reynolds saw two (2) minors, one of whom was standing beside a green bottle, while the other was holding a green bottle in his hand.  While Reynolds began to interview the two (2) young men, he looked into the home and observed what he thought may have been underage drinking.  Based on this observation, without a warrant or consent, Reynolds entered the Oliver residence, and he proceeded to seize those present and collect alcoholic beverages from the individuals present.

In the meantime, with Reynolds around back, Wentworth went to the front door of the home where he eventually made contact with Ms. Oliver, who was upstairs grading papers in her bedroom and claims she did not know her son and his friends were drinking.  Ms. Oliver contends that she did not invite Wentworth into her home, and that she asked Wentworth whether he needed a warrant before he could enter her house.  However, once inside, Wentworth heard that Reynolds had already entered the basement, and therefore, he informed Ms. Oliver that they would go downstairs to the basement to "clear this up."  In his deposition, Wentworth stated this was necessary in order to watch out for the safety of Reynolds.  At that point, it is not clear whether Wentworth had the consent of Ms. Oliver to enter her home.

The officers proceeded to search the home and divide the minors into groups of those who had been drinking and those who had not been drinking.  The minors' parents were telephoned so that they could receive rides home.  The officers claimed they were informed by some of the minors that parties at the Oliver residence had taken place before, and that minors had partaken in underage drinking at those parties.  After hearing that, the officers read Ms. Oliver her Miranda rights.  Upon her refusal to speak to them without the presence of an attorney, Reynolds arrested Ms. Oliver for third degree unlawful transaction with a minor, in violation of KRS 530.070(1)(a) & (b),  Class A misdemeanors.

## STANDARD

Summary judgment is available under Fed. R. Civ. P. 56(c) if the moving party can establish that the "pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact."  *Street v. Bradford & Co*., 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is "whether the party bearing the burden of proof has presented a jury question as to each element in the case." *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).  The plaintiff must present more than a mere scintilla of evidence.  To support this position, he must present evidence on which the trier of fact could find for the plaintiff.  *See id.* (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52

4

(1986)).  Mere speculation will not suffice to defeat a motion for summary judgment: "[t]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment.  A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

Finally, while Kentucky state law is applicable to this case pursuant to *Erie Railroad v. Tomkins*, 304 U.S. 64 (1938), a federal court in a diversity action applies the standards of Fed. R. Civ. P. 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (1991)."  *Gafford v. General Electric Co.*, 997 F.2d 150, 165 (6th Cir. 1993).

## DISCUSSION

For a plaintiff to assert a claim under § 1983, "a plaintiff must allege the deprivation of a constitutional right caused by a person acting under [the] color of state law." *Bell v. Ohio State University*, 351 F.3d 240, 248 (6th Cir. 2003)(*citing Black v. Barberton Citizens Hosp.*, 134 F.3d 1265, 1267 (6th Cir. 1998)).  Here, the Plaintiff contends that the Defendants violated her Fourth Amendment right to be free from unreasonable search and seizure, based upon the officers' entry into her home and her subsequent arrest by Reynolds.

The Defendants contend that the Plaintiff's claims under 42 U.S.C. § 1983 must fail because: 1) Wentworth's entry into Ms. Oliver's residence did not violate her Fourth Amendment rights; 2) Ms. Oliver's rights were not violated by Reynolds' entry into her curtilage; 3) Reynolds' entry of the basement was not a violations of the Plaintiff's Fourth Amendment rights; 4) Reynolds had probable cause to arrest Ms. Oliver; 5) Ms. Oliver cannot

5

establish that the City of Paducah failed to train, supervise or discipline Wentworth and/or

Reynolds; 6) Wentworth and Reynolds are entitled to qualified immunity; 7) the § 1983 claims

against the individual Defendants in their official capacities as well as the claims against the City

of Paducah fail because the Plaintiff cannot establish municipal liability; and 8) the Plaintiff's

state law claims against the Defendants for violating the Kentucky Constitution and for false

imprisonment fail as a matter of law.

In response, the Plaintiff argues that: 1) Reynolds and Wentworth are not entitled to

qualified immunity; 2) no probable cause existed to support the warrantless arrest of Ms. Oliver;

and 3) the City of Paducah had an unconstitutional custom of inadequate training, supervision,

and discipline, which amounts to liability under § 1983.

The Court shall address each of the arguments submitted by the Defendants separately.

### 1. Entry Into and Search Of the Oliver Residence by Officer Wentworth

"The Fourth Amendment provides that individuals shall be free from warrantless

unreasonable searches and seizures in their 'persons, houses, papers, and effects.' U.S. Const.

Amend. IV." *Hardesty v. Hamburg Tp.*, 461 F.3d 646, 651 (6th Cir. 2006).  The Supreme Court

has emphasized when it comes to Fourth Amendment protection "[i]n none is the zone of privacy

more clearly defined than when bounded by the unambiguous physical dimensions of an

individual's home." *Payton v. New York*, 445 U.S. 573, 589 (1980); *see also Ingram v. City of

Columbus*, 185 F.3d 579, 586 (6th Cir.1999).  In *Ingram*, the Sixth Circuit Court of Appeals

stated that "the Fourth Amendment 'has drawn a firm line at the entrance to the house,' a

threshold which police officers generally may not cross without a warrant." *Ingram*, 185 F.3d at

586-87 (quoting *Payton*, 445 U.S. at 590).  However, an exception to this rule exist when a

homeowner gives an officer "voluntary consent" to search the house. *Id.* at 587; *United States v. Rohrig*, 98 F.3d 1506, 1515 (6th Cir.1996); *Hardesty* at 651-52.

In the instant matter, Wentworth contends that the Plaintiff's Fourth Amendment claim for unconstitutional entry and search of her residence fails as a matter of law because Ms. Oliver gave Wentworth consent to search her home.  However, in looking at the facts stated by the McCracken District Court as well as examining the facts in a light most favorable to the nonmoving party, in this case the Plaintiff, a genuine dispute exists as to whether or not Ms. Oliver gave Wentworth consent to enter and search her residence.  While Wentworth asserts that Ms. Oliver gave him her consent, the Plaintiff states that she asked Wentworth if he needed a warrant before he could enter and that she did not explicitly tell Wentworth he could search her home.  Therefore, the Court finds that a dispute as to whether or not Oliver gave consent to Wentworth to enter her residence precludes summary judgment on this issue.

Wentworth also argues that even if there is an issue of fact as to whether consent was given to enter her residence and search the basement, he is still entitled to summary judgment because under the circumstances he heard Reynolds' voice in the basement, and therefore, he was lawfully permitted to go into the home and basement.

In support of this second argument, Wentworth cites the Sixth Circuit Court of Appeals case of *Sargent v. City of Toledo Police Dept.*, 150 Fed. Appx. 470, 473-74 (6th Cir. 2005).  In *Sargent*, police officers in that matter were responding to a "911" call made by a neighbor complaining of a loud party and noise disturbances coming from the home of the plaintiff. *Id.* at 472.  When the officers arrived at the house, they could hear "a loud commotion and voices shouting inside the house," saw a juvenile "passed out" in a car parked in front of the house, and

observed individuals on the front porch whom they believed to be juveniles. *Id.*  After the officers twice attempted to knock on the front door without a response, one officer proceeded to the back of the house. *Id.*  The officer who went to the back of the home observed what he believed to be juveniles running away from the home, and therefore, he decided to enter the home through an open back door. *Id.*  The other officer finished investigating the front of the house, then went to the back of the house where he discovered his partner inside the home and then decided to enter the house through the same open back door as his partner. *Id.*  In determining that the second officer who entered the home did not commit a Fourth Amendment violation for an unconstitutional warrantless intrusion, the Court reasoned that the on-going and continuous nuisance as well as other surrounding circumstances made the entrance of the second officer reasonable, and therefore, not in violation of the Fourth Amendment. *Id.* at 473-74.  The Court stated that under those circumstances, "no Fourth Amendment violation occurs when an officer follows a partner inside after the partner has already entered the home." *Id.* at 474.

Here, in contrast to *Sargent*, the circumstances surrounding the situation of the Plaintiff's house as well as how Wentworth entered the home, distinguish the holding in *Sargent* from the instant matter.  First, unlike *Sargent*, where a continuous nuisance was observed by the officers before they attempted and while they entered the home, there was no apparent continuing violation of the law at the Oliver residence before Wentworth and Reynolds entered the curtilage and residence that evening.  Second, in the instant matter, unlike *Sargent*, after Wentworth knocked at the front door, he made contact with Ms. Oliver at the front door, and neither he nor Reynolds observed juveniles running away at the back of the house.  Third, the door to the back of the home in *Sargent* was wide open, whereas in the instant matter Ms. Oliver was at the door

blocking the entrance of Wentworth.  Fourth, in *Sargent*, the officer who followed his partner into the home entered the home from the same entrance as his partner after seeing him in the house with another person, in contrast to the instant case, where Wentworth entered the home from a different entrance than Reynolds, and therefore, did not "follow" Reynolds into the home.[1]  Lastly, in contrast to *Sargent*, Wentworth's alleged illegal entry into the home may have taken place before he heard Reynolds down in the basement, and therefore, hearing Reynolds in the basement after the fact does not excuse the alleged initial illegal entry.  As such, the holding in *Sargent* does not apply to the instant matter.

Accordingly, the Court finds that the Fourth Amendment claim against Wentworth for unreasonable entry and search of the Oliver residence shall go forward at this time.

## 2. Entry Into the Curtilage and Residence of the Plaintiff, and Arrest of the Plaintiff by Officer Reynolds

Reynolds contends that his entry into the back driveway and backyard area, the porch, the basement, and subsequent arrest of the Plaintiff did not violate her Fourth Amendment rights.  In response, the Plaintiff argues that Reynolds needed a warrant to proceed to the back of the house and around the deck because the back driveway was a part of the home's curtilage, and therefore, the subsequent entry into the Oliver house and her arrest by Reynolds were unconstitutional. The Court shall address the constitutionality of each action taken by Reynolds.

### Entry into the Back Driveway & Backyard Area

In *Oliver v. United States*, the United States Supreme Court recognized that curtilage is a

---

[1]The Court notes that the Defendants do not argue the "exigent circumstance" exception to the warrantless search, but instead contend the entrance and search by Wentworth were reasonable under the circumstances.

part of the house itself, and therefore, Fourth Amendment protection extended to the curtilage. *Oliver v. United States*, 466 U.S. 170, 179-80 (1984).  The Court referred to some parts of curtilage as "the setting for those intimate activities that the [Fourth] Amendment is intended to shelter from government interference or surveillance." *Id.*

In *United States v. Smith*, the Sixth Circuit Court of Appeals, applying *Oliver*, examined whether a driveway could be considered curtilage for purposes of Fourth Amendment protection. *United States v. Smith*, 783 F.2d 648, 651-52 (6th Cir. 1986).  In *Smith*, a police officer drove his car onto the unobstructed driveway of the defendant and observed marijuana plants growing in the back of the house. *Smith* at 651.  The Court stated that "[w]hether a driveway is protected from entry by police officers depends on the circumstances. The fact that a driveway is within the curtilage of a house is not determinative if its accessibility and visibility from a public highway rule out any reasonable expectation of privacy," and also noted that factors to be used in making the decision included "accessibility and visibility." *Id.*

Ultimately, the Court held that the defendant did not have a reasonable expectation of privacy in the area where the marijuana plants were observed, reasoning that because the defendant had grown large plants in an open and unobstructed area, the Fourth Amendment did not protect that particular physical location. *Id.* At 651-52; *see also Knott v. Sullivan*, 418 F.3d 561, 573-74 (6th Cir 2005)(citing *Smith*, and holding that entry by police officer onto a "shared" driveway that was visible from the public road did not violate the Fourth Amendment rights of the plaintiff).  The Court in *Smith* also stated that "[t]he fact that a driveway is within the curtilage of a house is not determinative if its accessibility and visibility from a public highway rule out any reasonable expectation of privacy." *Id.* at 651.

10

In *Daughenbaugh v. City of Tiffin*, the Sixth Circuit Court of Appeals, in quoting the Supreme Court case of *United States v. Dunn*, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), set out four (4) factors courts should use to determine whether an area constitutes curtilage for purposes of Fourth Amendment protection. *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 598 (6th Cir. 1998).  These factors are: "'[1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing.'" *Id.* (quoting *Dunn*, 480 U.S. at 301). When using these factors to assist in a curtilage analysis, the central inquiry by the court is whether "the 'intimate activity [is] associated with the sanctity of a man's home and the privacies of life.'" *Id.*  Or, stated simply, whether the defendant had a reasonable expectation of privacy in the area near the home. *Dunn* at 300.  In addition, courts should recognize that "'[e]very curtilage determination is distinctive and stands or falls on its own unique set of facts.'" *Daughenbaugh* at 598. (quoting *United States v. Reilly*, 76 F.3d 1271, 1276 (2d Cir.1996)).

In looking at the first *Dunn* factor, the back driveway sits adjacent to the curtilage of the house, as it runs parallel to the deck and patio area at the back of the home.  This area is easily accessible from the back patio as well as the basement, which opens up into the backyard. Accordingly, the first *Dunn* factor supports a finding that the driveway is curtilage.

In looking at the second *Dunn* factor, the enclosure of the area in question, the Court must look to "'the conception defining the curtilage-as the area around the home to which the activity of home life extends-is a familiar one easily understood from our daily experience.'"

11

*U.S. v. Jenkins*, 124 F.3d 768, 773 (6th Cir. 1997)(quoting *Oliver*, 466 U.S. at 182 n. 12).  Unlike the front and side driveways, which are visible to the public and accessible from the main street, the back driveway is enclosed by a fence that surrounds the three-sides of the backyard as well as trees that cover the backyard.  Although this back driveway is not completely enclosed, as one could follow the side driveway to reach the back driveway, full enclosure is not necessary to satisfy the second factor. *See Jenkins*, 124 F.3d at 773.  Similar to *Jenkins*, the back driveway is obstructed from the main road by the house. *Id.*   Accordingly, the second *Dunn* factor supports a finding that the back driveway is curtilage.

In looking at the third *Dunn* factor, the nature of the back driveway was to park cars of the residents and get access to the back patio, backyard, porch and basement.  These activities relate more to intimate activities associated with the use of a home, rather than activities that could be viewed by the general public.  Accordingly, the third *Dunn* factor supports a finding that the driveway is curtilage.

Lastly, in looking at the fourth *Dunn* factor, the steps taken by the resident to protect the area from observation from people passing by, the back driveway area in question is located behind the house, and therefore, is well shielded from the view of the public passing by the home. *See Jenkins* at 773.  In addition, behind the home where the driveway sits, a fence and trees surround the area and shield it from behind as well as on its sides as well.  Accordingly, the fourth *Dunn* factor supports a finding that the driveway is curtilage.

In reviewing all four (4) factors collectively, the Court finds that the Plaintiff had a reasonable expectation of privacy in the backyard area of her home, including the back driveway, and therefore, that area is curtilage and is entitled to Fourth Amendment protection.

*See Daughenbaugh*, 150 F.3d at 601 (quoting *Dow Chemical Co. v. United States*, 749 F.2d 307 (6th Cir.1984), *aff'd*, 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986)) (holding that "'[t]he backyard and area immediately surrounding the home are really extensions of the dwelling itself,'" and therefore, an officer's entrance into the backyard constituted a search in violation of the Fourth Amendment).  This finding is consistent with the conclusion of law reached by the McCracken District Court, where the Court in that matter noted that the backyard of the Oliver home "is not impliedly open to the public."[2]

Reynolds argues that even if the driveway is considered curtilage, the actions of Reynolds did not violate the Fourth Amendment because law enforcement officers are permitted to enter curtilage of a home in order to question its occupants. *See U.S. v. Hopper*, 58 Fed. Appx. 619 (6th Cir. 2003).   However, as stated by Reynolds, his purpose in entering the curtilage of the Plaintiff's house was not to questions its occupants, but was to prevent minors from possibly escaping from the back of the house.  This goal could have been accomplished if Reynolds stopped at the end of the side driveway, rather than continuing further into the Oliver property, around the deck and eventually to the basement entrance.

Further, it is unclear where Reynolds was standing when he spotted the minors by the back porch.  In his deposition he states that he "was around back" when he saw them holding and/or sitting next to green bottles.  As the Court cannot state with certainty where Reynolds stood when he observed the minors, it cannot be determined if Reynolds was or was not standing

---

[2]In the Defendants' Reply Memorandum, they state that the Court should not consider the opinion of the McCracken District Court.  The Court recognizes that the holding of that Court does not bind this Court as to the civil claims filed against the officers.  However, the Court may consider the decision by that Court to grant the motion to suppress when considering the evidence at this juncture, so long as the Court does not apply that decision preclusively to instant matter. *See Knott v. Sullivan*, 418 F.3d 561, 568 (6th Cir. 2005).

in the curtilage of the home before seeing them.  In looking at these facts in a light most favorable to the nonmoving party, in this case the Plaintiff, at this time, the Court must assume that Reynolds was standing in the curtilage of the Oliver residence when he spotted the minors by the porch.  Accordingly, his desire to question the minors after entering the curtilage would not excuse his prior entry onto the curtilage without a warrant. *See Daughenbaugh*, 150 F.3d at 601.

Reynolds was also contends that even if he needed a warrant to search the back driveway area, "exigent circumstances" existed that permitted a warrantless entry under the circumstances. There are four (4) situations that may give rise to an exigent circumstance, and these include: (1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, and (4) a risk of danger to the police or others. *Brigham City, Utah v. Stuart*, 126 S. Ct. 1943, 1947 (2006))  As set forth by the Defendant, "in order to satisfy the exigent-circumstances exception in the present case, [the officer] must show that there was a risk of serious injury posed to the officers or others that required swift action. *See id.*  In reviewing whether exigent circumstances were present, we consider the 'totality of the circumstances and the inherent necessities of the situation at the time.' *United States v. Rohrig*, 98 F.3d 1506, 1511 (6th Cir.1996)." *U.S. v. Huffman*, 461 F.3d 777, 783 (6th Cir. 2006)(citing *Stuart*, 126 S. Ct. at 1947).

Without identifying a recognized exigent circumstance, Reynolds argues that under the circumstances he did not need a warrant because he reasonably believed that there were intoxicated minors in the home; that minors often attempt to escape from the back of the home; and the residence was near a busy highway, where he believed the minors could endanger

themselves or others if they attempted to escape.  However, as noted *supra*, to accomplish these goals, Reynolds did not need to continue around the patio and into the more private area of the Oliver residence.  When Reynolds decided to go to the back of the home, neither he nor Wentworth had any direct evidence that suggested there were intoxicated minors at the Oliver residence, but instead Reynolds relied upon a hunch that he believed the initial minor he had encountered in front of the home may not have been forthcoming.  However, Reynolds does not recall with certainty if either he or Wentworth had even inquired about alcohol in the home, and Wentworth stated they he believed the minor at the front of the home was not intoxicated.

The only knowledge that the officers had at that point was from a tip, which did not even identify the Oliver residence.  This suggests that exigent circumstances were not present when Reynolds went around to the back of the house because he did not know of nor have any firsthand reason to suspect an on-going crime taking place at the residence.

Accordingly, the Court finds that Fourth Amendment claim against Reynolds for entering the curtilage of the Oliver home without a warrant shall go forward at this time.

### Entry into the Porch and Basement

In *Daughenbaugh*, the Sixth Circuit Court of Appeals, in applying *Dunn*, stated:

The broadest principle that may be inferred from the *Dunn* opinion is that officers may constitutionally view a protected area as long as they make their observations from a lawful vantage point-i.e., a place located outside of the curtilage. *Id.* (holding that as long as officers were "standing ... in the open fields, the Constitution did not forbid [the officers] to observe" the area assumed to be curtilage)...*None of the cases, however, permit officers to begin a warrantless search while standing in a constitutionally protected area*. In the instant case, the district court found that the officers first spotted the stolen items when they stood in the backyard. While the Supreme Court has never required that "law enforcement officers ... shield their eyes when passing by a home on public thoroughfares." *California v. Ciraolo*, 476 U.S. 207, 213, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986), the officers still must observe the area being searched from a lawful vantage point. *See Dunn*, 480 U.S. at 304, 107

S.Ct. 1134.

*Daughenbaugh*, 150 F.3d at 601 (emphasis added).  Here, as determined *supra*, Reynolds entered into the backyard area along the back driveway; an area that the Court has determined is part of the curtilage of the Oliver residence.  Reynolds states that he observed the minors with alcoholic beverages in their possession and/or in their general area from this back driveway area, which was constitutionally protected, before he proceeded into the porch and basement of the Oliver residence without a warrant.  As held in *Daughenbaugh*, an officer may not begin a warrantless search while standing in a constitutionally protected area. *Id.*

Reynolds argues that exigent circumstances existed in this matter that justify Reynolds' encroachment into the porch and basement.  Reynolds offers some of the same reasons previously argued, regarding the entry into the back driveway, to justify his entering the porch and basement, asserting that minors often attempt to escape from the back of the home and the residence was near a busy highway, where he believed the minors could endanger themselves or others if they attempted to escape.  However, as noted *supra*, Reynolds could have accomplished these goals by waiting at the end of the side driveway and not proceeding around the deck.  Reynolds also argues that in the alternative, exigent circumstances existed because he needed to prevent the destruction of evidence.  However, Reynolds freely admits that he did not eventually seize this evidence and/or use it to determine the individuals who were drinking that evening (a breathalyzer test was used later that evening), as such bottles are usually destroyed during such instances.  Therefore, the Court finds that the reasons offered by Reynolds do not excuse the warrantless entry conducted by Reynolds.

Accordingly, the claims that Reynolds violated the Fourth Amendment rights of the

16

Plaintiff by entering her porch and basement without a warrant shall go forward at this time.

### *Warrantless Arrest of Ms. Oliver*

The Sixth Circuit Court of Appeals, in *U.S. v. Caicedo*, stated that the "[p]olice may arrest a person without a warrant if they have probable cause at the time of the arrest to believe that the person has committed or is committing a crime. *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1508 (6th Cir.1988)." *U.S. v. Caicedo*, 85 F.3d 1184, 1192 (6th Cir. 1996).  While probable cause is a more stringent standard than reasonable suspicion, it does not require the officer to prove his/her suspicions to be correct or more likely true than false. *Id.*  "[B]ecause the probable cause inquiry is an objective one, the officer's subjective reasons for making an arrest need not be the criminal offense for which the known facts provided probable cause. *Devenpeck v. Alford*, 543 U.S. 146, 153, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004).  Rather, the existence of probable cause 'depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.' *Id*. at 152." *Fox v. DeSoto*, 2007 WL 1584212, *6 (6th Cir. 2007).

In the instant case, Reynolds arrested Ms. Oliver and charged her with violating KRS 530.070(1)(a) & (b).  That statute states, in pertinent part:

A person is guilty of unlawful transaction with a minor in the third degree when:

(a) Acting other than as a retail licensee, he knowingly sells, gives, purchases or procures any alcoholic or malt beverage in any form to or for a minor. The defendant may prove in exculpation that the sale was induced by the use of false, fraudulent, or altered identification papers or other documents and that the appearance and character of the purchaser were such that his age could not have been ascertained by any other means and that the purchaser's appearance and character indicated strongly that he was of legal age to purchase alcoholic beverages. This subsection does not apply to a parent or guardian of the minor; [or]

(b) He knowingly induces, assists, or causes a minor to engage in any other criminal

activity.

At the time Reynolds arrested Ms. Oliver, the following facts had been discovered: 1) a party was taking place at the Oliver residence; 2) sixteen (16) minors were charged with possession of alcohol; 3) Oliver was upstairs in her bedroom and claims that she did not know about the size of the party; and 4) alcohol was in plain view in the basement of the Oliver residence.  Reynolds also claims that after he and Wentworth broke up the party, some of the minors informed him that parties at the Oliver residence where alcohol is available to minors are common, and that the Plaintiff not only knew that these parties took place, but also may have supplied a refrigerator in the basement for the purposes mentioned.  Under these circumstances, Reynolds decided to arrest Ms. Oliver in violation of KRS 530.070(1)(a) & (b).

Based on what was known and what Reynolds claims he was told by minors after the party was broken up, the arrest of Ms. Oliver was reasonable under the circumstances because Reynolds had probable cause to arrest her.  Regardless of the fact that the charges against Ms. Oliver were eventually dropped, Reynolds had probable cause to suspect that Ms. Oliver knew that minors were partaking in the consumption of alcohol because of the known circumstances at the residence that evening.  Accordingly, the Court finds that the warrantless arrest of Ms. Oliver did not violate her Fourth Amendment rights, as Reynolds had probable cause to arrest her under the circumstances.[3]

### 3. Qualified Immunity for Wentworth & Reynolds

The Defendants contend that even if their actions violated the Fourth Amendment rights

---

[3]Even assuming that Reynolds did not have probable cause to arrest Ms. Oliver, he would be entitled to qualified immunity as to this claim. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Saucier v. Katz*, 553 U.S. 194, 201 (2001).

of Ms. Oliver, they are still entitled to qualified immunity.

In *Harlow v. Fitzgerald*, the United States Supreme Court held that government officials performing discretionary functions are generally shielded from civil liability so long as their conduct does not violate constitutional rights or statutory provisions of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The analysis to determine whether an officer is entitled to qualified immunity is a two-step process that includes: 1) taking into consideration whether a constitutional right has been violated; and 2) if so, determining whether it is a clearly established right that a reasonable official under the circumstances should know. *Wilson v. Layne*, 526 U.S. 703 (1999); *Saucier v. Katz*, 553 U.S. 194, 201 (2001). In *United States v. Lanier*, the United States Supreme Court held that the existence of a decision within a circuit is not necessary for a court to determine if there is clearly established law, but only that a reasonable person under the circumstances would know that their actions violated another person's constitutional right. *United States v. Lanier*, 520 U.S. 259, 265-66 (1997). Additionally, the officer must have "fair warning" that their conduct was unconstitutional. *Hope v. Pelzer*, 122 S. Ct. 2508, 2516 (2002).

As the Court has determined that Fourth Amendment claims for unreasonable search against each of the Defendants shall go forward at this time, the first part of the two-part test has been met. As such, the Court must determine whether the alleged constitutional violations were so clearly established that a reasonable officer should have known of the violation under the circumstances. The Court shall determine the second part of the test as to each individual Defendant.

### Officer Wentworth

Wentworth argues that the Plaintiff cannot meet her burden in proving that a reasonable officer in his situation should have known that his actions could violate the Fourth Amendment. Wentworth asserts that he had voluntary consent to enter the home and basement, and a fellow officer in his position would not leave an officer alone in the basement.  He also contends it was reasonable for him to believe that Reynolds was lawfully in the basement, and that he did not intentionally or knowingly violate the rights of the Plaintiff.

Here, the inquiry is whether Wentworth should have reasonably known under the circumstances that he may have violated the constitutional rights of the Plaintiff when he entered her home without a warrant.  As determined *supra*, a genuine dispute exists as to whether Wentworth had voluntary consent to enter the home and basement of the Oliver residence. Under the circumstances, where the officers had no direct evidence prior to their entry into the home, basement and/or curtilage of the Oliver residence that minors were consuming alcohol, the officers had no reason, except a tip that did not even identify the Oliver residence, to believe that any illegal activity was taking place.  Therefore, a reasonable officer under similar circumstances as Wentworth should have known that he needed the permission of Ms. Oliver, confirmation by Reynolds or a search warrant to enter her home and basement.

As mentioned *supra*, Wentworth's alleged illegal entry into the home may have taken place before he heard Reynolds down in the basement, and therefore, hearing Reynolds in the basement after the fact does not excuse the alleged initial illegal entry.  Further, there are no facts to indicate that Wentworth suspected and/or had reason to suspect an immediate threat to Reynolds once he heard him in the basement or that upon hearing Reynolds in the basement Wentworth knew an illegal activity was taking place. *See Graham v. Connor*, 490 U.S. 386, 396

20

(1990).  Lastly, whether Wentworth intentionally or knowingly violated the constitutional rights of Ms. Oliver is not a factor in this analysis, as the Court conducts an objective analysis to determine whether a reasonable officer under the circumstances should have known that his actions were unlawful, not a subjective analysis to see whether the Defendant intentionally or knowingly sought to violate the rights of the Plaintiff. *Blake v. Wright*, 179 F.3d 1003, 1008 (6th Cir.1999) (noting that qualified immunity "reflects an objective standard, making the official's subjective intent irrelevant.").  Accordingly, Wentworth is not entitled to qualified immunity in this matter for his entry into the basement of the Oliver residence.

### *Officer Reynolds*

Reynolds asserts that he is entitled to qualified immunity because it was reasonable for him to enter the curtilage and home of Ms. Oliver to prevent the escape of minors and to protect them and the public from risks and dangers.  However, as noted *supra*, Reynolds could have accomplished this going by stopping at the end of the side driveway.  That view gave him a clear sight into the backyard and any possible escape routes for the minors.  Further, once Reynolds reached the end of the side driveway, he had not seen nor heard any evidence that indicated a crime was taking place.  Therefore, a reasonable officer under similar circumstances as Reynolds should have known that he needed the permission of Ms. Oliver or a search warrant to enter into her curtilage or home.  Lastly, as stated *supra*, whether Reynolds intentionally or knowingly violated the constitutional rights of Ms. Oliver is not a factor in this analysis, as the Court conducts an objective analysis to determine whether a reasonable officer under the circumstances should have known that his actions were unlawful, not a subjective analysis to see whether the Defendant intentionally or knowingly sought to violate the rights of the Plaintiff. *Blake*, 179 F.3d

21

at 1008.  Accordingly, Reynolds is not entitled to qualified immunity in this matter for his entry into the curtilage and basement of the Oliver residence.

**4. Claims Against Wentworth & Reynolds in Their Official Capacities and Claims Against the City of Paducah**

The United States Supreme Court has held that a "suit against a state official in his or her official capacity is not a suit against the official, but rather a suit against the official's office." *Will v. Michigan Dept. Of State Police*, 491 U.S. 58, 67 (1989).  As such, a suit against a government agent in their official capacity equates to a suit against the government agency in question.   In the instant matter, the office of Wentworth and Reynolds is the City of Paducah.  The Plaintiff asserts that in their official capacities, the actions of Wentworth and Reynolds are linked to the City of Paducah under *Monell v. Department of Social Services. Monell v. Department of Social Services*, 436 U.S. 658 (1978).  A municipality may be held accountable for the actions of their employees *only* if these actions stem from the municipalities' own unconstitutional and illegal policies. *Monell* at 690-91 (emphasis added).  The conduct of officers acting illegally in their official capacity does not automatically equate with municipal liability, as municipalities cannot be sued for the acts of their employees, unless such acts stem from a policy or custom of the municipality. *Id.*  Therefore, this Court finds that liability against the City of Paducah cannot come solely from the acts of Wentworth and Reynolds in their official capacity.

However, a municipality may be liable under §1983 through: (1) actions of legislative bodies; (2) agencies exercising delegated authority that amounts to an official policy; (3) the actions of individuals with final decision-making authority; (4) policies of inadequate training or

supervision; or (5) custom. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 473, 480, 481-484 (1986); *Monell* at 661 and 694; *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387-390 (1989). Here, the Plaintiff contends that a municipal policy of the City of Paducah can be proven through ways (4) & (5).  The Court shall address each of these separately.

### *Inadequate Training and Supervision*

The United States Supreme Court has held that in order to show a policy of inadequate training, the Plaintiff must prove deliberate indifference by the local government. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387-390.  A municipal policy that causes constitutional violations can be the basis for a §1983 claim. *Id*. at 387.  However, the Court in *Harris* stated that only when the failure to train is a deliberate or a conscious choice by the municipality can a city be liable under §1983. *Id.* at 389.  The Court noted two circumstances that would lead to a deliberate and indifferent failure to adequately train including: failure to provide adequate training in light of foreseeable serious consequences that could result from a lack of instruction, such as how to use a firearm; and when a city fails to act in response to repeated complaints of unconstitutional acts by its officers. *Id.*

In *Commissioners of Bryan County, Oklahoma v. Brown*, the Supreme Court stated that the culpability of a municipality  must be more than mere probability that an officer could cause the constitutional injury, but rather it must depend on the high likelihood that the officer would inflict the particular injury suffered by the plaintiff. *Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 412 (1997).  The Sixth Circuit recognized the *Brown* approach in *Jefferson County, Kentucky v. Lindsay*, emphasizing that a  "plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or

statutory right will follow the decision." *Jefferson County, Kentucky v. Lindsay*, 124 F.3d 197, *4 (1997).

In the instant case, the Plaintiff contends that the City of Paducah ("the City") failed to inadequately train Reynolds to prevent violations because the City was aware that Reynolds repeatedly violated police policies, and that none of his punishments improved his conduct as an officer.  The Plaintiff referenced five (5) incidents prior to his entry of the Oliver residence, arguing that these violations by Reynolds proves deliberate indifference to the Fourth Amendment rights of the Plaintiff.  These incidents include: 1) towing a vehicle in violation of department policies; 2) a letter of counseling after losing control of his police vehicle; 3) a three (3) day suspension for an unprofessional joke on a fellow officer; 4) striking a suspect using more force than necessary; and 5) hitting the curb with his police vehicle.

As set out *supra*, a "plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Lindsay*, 124 F.3d at *4.  Here, the Plaintiff has not demonstrated that the City and/or its police department were deliberately indifferent to the Fourth Amendment rights of citizens, in particular, improper searches.  None of the violations put forth by the Plaintiff show that the City failed to train Reynolds as to the Fourth Amendment rights of citizens or that the City failed to act on repeated complaints against Reynolds.  Accordingly, the Court finds that the City of Paducah did not inadequately train or supervise its officers.

### *Custom*

The United States Supreme Court has held that municipal governments can be sued for their customs that cause constitutional violations, even if such customs have not been approved

24

by a legislative body.  *Pembaur*, 475 U.S. at 481-482 n.10.  The Sixth Circuit Court of Appeals, in *Doe v. Claiborne County, Tenn.*, stated that a "custom," for purposes of *Monell* and §1983, is "so permanent and well settled as to constitute a custom or usage with the force of law...[i]n turn, the notion of 'law' must include [d]eeply embedded traditional ways of carrying out state policy...[i]t must reflect a course of action deliberately chosen from among various alternatives. In short, a 'custom' is a 'legal institution' not memorialized by written law." *Doe v. Claiborne County, Tenn.*, 103 F.3d 495, 507-08 (6th Cir.1996) (internal citations omitted).  In *Doe*, the Court determined that the municipality did not have a custom of inaction that amounted to liability under *Monell* in failing to respond quickly enough to or acting passive during an investigation of a rape victim by a municipality employee.  The Court used a four step analysis from *City of Canton v. Harris* that examined: (1) the existence of a clear and persistent pattern of unconstitutional conduct by employees; (2) notice or constructive notice on the part of the municipality; (3) the municipality's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the municipality's custom was the "moving force" or direct causal link in the constitutional deprivation. *Harris*, 109 U.S. at 1204-05.

Here, the Plaintiff has not put forth sufficient evidence to show customs that caused the alleged unconstitutional violations.  The Plaintiff has merely asserted that the City developed a custom of tolerating policy violations by officers; however, the Plaintiff has neither alleged nor proven that this custom caused constitutional violations.  Further, not all of the incidents cited by the Plaintiff concerning the conduct of Reynolds involve potential constitutional violations.  As noted *supra*, the Plaintiff has not shown that the City took any deliberate acts to turn a blind eye

25

to the conduct of Reynolds or that Reynolds' prior acts were related to the alleged Fourth

Amendment violation at the Oliver residence.  The Plaintiff has not demonstrated: a pattern by

the City; that the City was put on notice of Reynolds' unconstitutional conduct; that the City

approved of or turned a blind eye to the conduct; or that the alleged custom was the moving

force or direct link to the alleged constitutional violation in this matter.  Therefore, the Court

finds the City of Paducah did not have a custom of committing, tolerating or acquiescing to

constitutional violations.

Accordingly, all the federal claims against Reynolds and Wentworth in their official

capacities, and all federal claims against the City of Paducah, fail as a matter of law.

### 5. State Law Claims Against the Defendants

Aside from her federal claims, the Plaintiff claims that Reynolds and Wentworth violated

her rights under Section 10 of the Kentucky Constitution, and that Reynolds falsely imprisoned

the Plaintiff when he arrested her.  The Court shall address each of these claims separately.

### Section 10 of the Kentucky Constitution

Both the Fourth Amendment to the United States Constitution and Section Ten of the

Kentucky Constitution guarantee "[t]he right of the people to be secure in their persons, houses,

papers, and effects, against unreasonable searches and seizures."  Section 10 states "[t]he people

shall be secure in their persons, houses, papers and possessions, from unreasonable search and

seizure; and no warrant shall issue to search any place, or seize any person or thing, without

describing them as nearly as may be, nor without probable cause supported by oath or

affirmation."  The Kentucky Supreme Court has stated that "'section 10 of the Kentucky

Constitution provides no greater protection than does the Federal Fourth Amendment.'" *Rainey*

26

*v. Com.*, 197 S.W.3d 89, 91 (Ky. 2006)(quoting *LaFollette v. Commonwealth*, 915 S.W.2d 747,

748 (Ky.1996)).  As such, the analysis for the state law claim under Section 10 of the Kentucky

Constitution shall be the same as the federal claim. *Id.*

        The Defendants have incorporated and adopted their previous arguments that address the

Fourth Amendment claims, and applied those arguments to the claims under Section 10 of

Kentucky Constitution.  As determined *supra*, the Fourth Amendment claims against both

Wentworth and Reynolds shall go forward at this time.  Accordingly, the Plaintiff's Section 10

claims against Wentworth and Reynolds shall go forward at this time.

### False Imprisonment

        Kentucky recognizes the civil tort of false imprisonment, however, such a cause of action

cannot be maintained when the officer had "valid or apparently valid" power to arrest. *Rader v.

Parks*, 258 S.W.2d 728, 729 (Ky. 1953)(stating "[a]n action for false imprisonment may be

maintained where the imprisonment is without legal authority. But, where there is a valid or

apparently valid power to arrest, the remedy is by an action for malicious prosecution. The want

of lawful authority is an essential element in an action for false imprisonment. Malice and want

of probable cause are the essentials in an action for malicious prosecution.'").  As such, a

plaintiff alleging such a claim must establish that his/her arrest/imprisonment was without legal

authority. *Id.*; *see also Dean v. Earle*, 866 F. Supp. 336, 339 (W.D.Ky.1994).

        Here, as determined *supra*, Reynolds had the valid legal authority to arrest Ms. Oliver

under the circumstances because he had probable cause to make the arrest.  Accordingly, the

false imprisonment claim fails as a matter of law.

**CONCLUSION**

For the foregoing reasons, the Defendants' Motion for Summary Judgment (Docket #16) is **GRANTED in part** and **DENIED in part**.  The Fourth Amendment claim against Wentworth, for entering the Oliver residence without a warrant or permission, and the Fourth Amendment claims against Reynolds for entering the curtilage and basement of the Oliver residence, shall go forward at this time.  In addition, the state law claims against Wentworth and Reynolds for allegedly violating Section 10 of the Kentucky Constitution shall go forward at this time.

The Fourth Amendment claim against Reynolds for the arrest of the Plaintiff fails as a matter of law.  In addition, the federal claims against Reynolds and Wentworth in their official capacities and the federal claims against the City of Paducah fail as a matter of law.  Lastly, the state law claim against Reynolds for false imprisonment fails as a matter of law.

An appropriate order shall issue.